## LEVISON v. BALFOUR et al.

*(Circuit Court, N. D. California. March 19, 1888.)*

1. FACTORS AND BROKERS—AUTHORITY—CONSTRUCTION OF CONTRACT.

A direction to sell "Blum's shells; total shipment; not under £85 per ton," does not authorize the consignee to sell parts of the shipment of average quality, at or above the limit, and thus throw the part unsold upon the hands of the owner. The consignee is only authorized to sell in one lot, or, at least, to sell the whole in such manner as to realize the price limited for the whole lot.

2. SAME—EXCEEDING AUTHORITY—LIABILITY TO CONSIGNOR.

Where a consignee of goods of different qualities is only authorized to sell the whole in one lot, at a limited price per ton, sells a part of average quality at a price above the limit, but does not sell the remainder, he is liable to account to the consignor for the whole at the price limited.

*(Syllabus by the Court.)*

At Law. Action by H. Levison against A. Balfour and others.

*Fox & Kellogg,* for plaintiff.

*Page & Eels,* for defendants.

Before SAWYER, Circuit Judge.

SAWYER, J. Prior to July 30, 1885, Leon Blum had a shipment of three qualities of mother-of-pearl shells, amounting in the aggregate to 25 tons and a fraction, in the hands of the defendants' Liverpool agents for sale. He transferred the shells to plaintiff, and on July 30th notified defendants of the fact. He introduced plaintiff to Mr. Bruce, one of the defendants, and a verbal arrangement was made between Mr. Bruce, on behalf of the defendants, and plaintiff, to continue them in defendants' hands for sale until they were otherwise disposed of. In the language of the plaintiff, they were to be sold at "eighty-five pounds sterling per ton for the total consignment." Plaintiff also used the word "telquel," signifying "as is." In the language of Mr. Bruce, defendants were authorized "to sell the total shipment not under eighty-five pounds per ton," and these statements are corroborated by two other witnesses, Blum and Marshal, who were present. Mr. Bruce made a pencil memorandum of a dispatch to be sent to his Liverpool house, and promised to send Mr. Levison a copy of his dispatch. Accordingly a letter dated on that day was immediately sent by defendants to plaintiff, in which they inclosed copy of invoice and other papers relating to the matter, and said, among other things: "As requested by you, we will cable our Liverpool friends as follows: 'Blum shells, total shipment, arrange at not under £85.' By mail we shall advise Messrs. Balfour, Williamson & Co. that Mr. Blum has transferred the entire shipment to you, and if unsold they will, when called upon, deliver the same to your order on payment of freight and all charges which have been incurred at Liverpool. It is understood that if our friends sell the shells they will charge the usual commission of 2½ per cent., exclusive of brokerage, on the gross amount, in which case you will receive credit for commissions now charged by us on the amount

originally advanced to Mr. Blum, and which has this day been paid,"— the amount so advanced being $7,000. Defendants on that afternoon sent to their Liverpool firm a telegram as follows: "Blum shells per Bell Rock. Total shipment. Arrange at not under 85 pounds per ton." On September 28th, by letter of that date, defendants notified plaintiff of a sale of four tons of the shells, made up of proportional parts of different qualities. The parts sold were taken from the different qualities of shells in such proportion as to leave the average quality a little higher than, or at least fully as high as, the portion sold. The shells sold for £87.10 per ton. The report of sales contained no charge of commissions. They report sales, and in their letter add: "And we trust same will be satisfactory." The plaintiff promptly replied to defendants' said report by letter dated September 30th, in which he says:

"In reply to yours of 28th instant, I beg to say, that the authority to sell shells ex Bell Rock was 'total shipment,' only, and not in lots. I reject the affirmance of your advice to me of the 28th instant. I am compelled to hold you to original terms, referring to your letter of July 30, 1885, quoting £85 for the total shipment."

To this letter the defendants replied by letter of same date:

"We are in receipt of your favor of date, and regret you do not seem willing to approve of our friends' small sale of shells ex Bell Rock. Their advices state that the four tons would be made up of proportional quantities of the three lots, and as their buyer had good hopes of placing the remainder, they were induced to make the sale. We consider our friends acted entirely for your interest, and on their behalf we decline to view the matter in any other light. As it however does not appear that our friends are likely to give satisfaction, we will thank you to instruct your agent to take delivery of the shells —subject to payment of charges which have accrued thereon—and as we shall also request Messrs. Balfour, Williamson & Co. to take no further steps to sell them."

On the same date, September 30th, defendants sent plaintiff a note as follows:

"Referring to our letter of even date, we now hand you order on our Liverpool house for the delivery of the balance of the shipment of pearl shells per Bell Rock, and inclosed with it an order dated September 30, 1885, addressed to Messrs. Balfour, Williamson & Co., Liverpool, as follows: 'Please deliver to the order of Wm. H. Levison, San Francisco, the balance of the shipment of pearl shells per Bell Rock (ss) on payment of all charges which have accrued thereon.'"

Plaintiff again immediately confirmed his former letter, repudiated said sales, returned the order for balance of shells, demanded a delivery of the whole consignment of shells, and offered to pay all charges against the same upon such delivery, but refused to receive the said shells remaining after said sale, or less than the whole lot. The defendants, being unable to deliver the whole lot, declined on that ground, and thereupon the plaintiff demanded payment for the whole 25 and a fraction tons of said shells, less charges, at the price of £85 per ton, which defendants refused to pay, whereupon this suit was promptly brought, October 17, 1885, to recover the said sum as for a conversion. The account of sales furnished by defendants and introduced in evidence showed sales to the

amount of about one ton and a half more than the four tons before reported sold, the same being of an average quality, and at prices above the £85 limit, but this latter was not reported to plaintiff till long after suit was brought.

'Upon the facts stated, the question arises whether the defendants' authority to sell was limited to a sale of the whole lot, at a single sale, or whether they were authorized to sell in small lots when opportunity occurred, provided the lots sold were of an average quality, and not sold below the limit of £85 per ton. The terms of the final contract must be regarded as expressed in defendants' letter of July 30, 1885, wherein they give the instructions as telegraphed 'to their correspondents in Liverpool, viz.: "Blum's shells; total shipment; arrange at not under £85." These are the terms of the contract as finally expressed in writing by defendants themselves; which were accepted by plaintiff by acquiescing without objection upon receipt of defendants' letter, and which he subsequently insisted upon by referring to it as containing the contract in his letter of September 30th, respecting the sale. The rights of the parties must therefore depend upon the construction of the contract as thus expressed. Upon a careful consideration of the contract, I think the reasonable and fair construction of the language is, that the defendants were limited to a sale of the shipment in a single lot at one sale, or that, if they assumed to sell in parcels, even at higher prices, they assumed the risk of being unable to sell the balance at such prices as to make a sale of the whole cargo yield £85 per ton. They were not authorized to sell small lots, and throw the remainder which they were unable to sell back upon the hands of the owner; and by so selling a part, without the authority of the owner, and thus putting it out of their power to return the whole shipment, they rendered themselves liable to account for the whole lot at the price limited. That the plaintiff understood that he had by the contract limited the authority to sell in one lot, or at least that defendants should sell all at the price stated, there can be no possible doubt, for that was the construction he put upon it, and insisted upon at all times. He was not a jobber, but a wholesale dealer, and this was manifestly understood by defendants. He was not engaged in selling goods in small quantities, but dealing in whole shipments. That this was, also, the construction put upon the contract by defendants themselves there can be no doubt. In their report of sales on September 28th, after stating amount of sales and prices without charging their commissions on the parts sold, etc., they close their letter of advice with "we trust the same will be satisfactory." This would seem to indicate a consciousness of having exceeded their authority, for there was no occasion for this suggestion of a desired approval, if they supposed they had kept within their authority. But plaintiff immediately repudiated the sale as being without authority, calling their attention to the terms of the authority, as expressed in their letter to him of July 30th. The defendants immediately replied, not that they put a different construction upon the language, but urging that their correspondents had, in their judgment, and in the judgment of the defendants, acted, not within their

authority, "but entirely for your [plaintiff's] interest;" that they "were induced to make the sale" as their buyer had great hopes of placing the remainder, and added that "since our friends are not likely to give you entire satisfaction, we will thank you to instruct your agents to take delivery of the shells, subject to the payment of all charges which have accrued thereon." Now, this is not the language of parties who feel conscious of having acted within their authority, but rather of expostulation, seeking a ratification because they had acted in good faith, believing their action, though unauthorized, to be for their principal's best interest, and seeking approval on that ground. There is not the merest suggestion, directly, or inferentially, that the defendants did not understand the contract precisely as the plaintiff did. And there is no intimation anywhere in the evidence that the defendants construed the contract differently from the plaintiff, till we come to their answer to the complaint. If they entertained a different view of the meaning of the contract, when they sold in lots and the sale was repudiated, they were here called upon at the time to so state, but they did nothing of the kind. Had they for a moment supposed they had acted within their authority, they would certainly have planted themselves upon this authority, in their first communication, and would never have sought to excuse themselves, and seek approval on any other grounds. It is quite apparent, therefore, I think, that both parties construed the contract alike, and that the construction now sought to be put upon it by defendants is an after-thought. In my judgment, by selling a part, without authority, instead of the whole, and thereby putting it out of their power to return the whole shipment of shells to plaintiff on his demand, the defendants rendered themselves liable to account for the whole shipment at £85 per ton.

There was an attempt to prove that by the custom of merchants at San Francisco, this contract authorized a sale in parcels at or above the price limited. But this, if admissible to prove the fact, would be directly against the construction which both parties, as we have seen, themselves manifestly put upon the contract. Besides, the evidence does not satisfy me that there is any such recognized established custom. The precise case, as stated in the contract in writing, was not stated to the several witnesses, and the evidence, when carefully analyzed, at best only shows, I think, that if the goods are sold in parcels, the whole must finally be sold so as to produce the required amount. I do not think the evidence established the meaning of such contract to be that the consignee is authorized to sell a part of the goods at or above the limit and throw the balance back upon the hands of the owner. Upon the views I have expressed, the defendant must account for the shells at the rate of £85 per ton, and a recovery must be had for that sum after a deduction of commissions, brokerage, and other proper charges, upon the whole, less commissions already paid on the sum of $7,000. Of course the loss or gain to defendants will be only the difference between the price limited and the amount for which they ultimately sold the shells, which they had in their possession. It does not appear whether they have sold or not. An offer of £80 per ton for remainder appears to have been made. But upon the

view expressed, what the defendants ultimately lose or gain, as the case may be, cannot affect the amount of the recovery. I am not certain that the evidence furnished the means for ascertaining with mathematical precision the amount of commissions and charges to be deducted, and consequently the amount to be recovered. If so, counsel can first agree upon the amount, and it will be inserted in the findings. If not, I will send it to a referee to ascertain the brokerage and charges. The contract fixed the commissions at $2\frac{1}{2}$ per cent., and the evidence shows that commissions on $7,000 have been paid. Let there be findings and judgment in pursuance of this opinion.